# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

---

PROTÉGÉ BIOMEDICAL, LLC,

                Plaintiff,

v.

Z-MEDICA, LLC,

                Defendant.

Civ. No. 18-3227 (JRT/HB)

**MEMORANDUM OPINION AND ORDER**

---

Kristine M. Boylan, O. Joseph Balthazor, Jr., and Matthew R. Brodin, **BRIGGS & MORGAN, PA,** 80 South Eighth Street, Suite 2200, Minneapolis, MN 55402, for plaintiff.

Rachel Ann Kitze Collins and Charles N. Nauen, **LOCKRIDGE GRINDAL NAUEN PLLP**, 100 Washington Avenue South, Suite 2200, Minneapolis, MN 55401, Philip O'Beirne and Michael Petrino, **STEIN, MITCHELL, BEATO & MISSNER LLP**, 901 Fifteenth Street Northwest, Suite 700, Washington, DC, 20005, for defendant.

This action arises out of patent and trade secret disputes between Plaintiff Protégé Biomedical, LLC ("Protégé") and Defendant Z-Medica, LLC ("Z-Medica"). Both Protégé and Z-Medica create hemostatic, or blood-clotting, products. In an effort to sell the company, Protégé engaged in an acquisition discussion with Z-Medica. Protégé alleges that it shared trade secret information with Z-Medica during that discussion and that Z-Medica wrongfully incorporated the trade secret information into its own patent. Protégé also alleges that, by using the trade secret information, Z-Medica breached a non-disclosure agreement.

Protégé brings the following claims against Z-Medica: (I) Breach of Non-Disclosure Agreement; (II) Violation of the Federal Defend Trade Secrets Act of 2016 ("FDTSA"), 18 U.S.C. § 1836; (III) Violation of the Minnesota Uniform Trade Secrets Act ("MUTSA"), Minn. Stat. § 325C.01; (IV) Unjust Enrichment; (V) Tortious Interference; (VI) Declaratory Judgment of Non-Infringement; and (VII) Declaratory Judgment of Invalidity of Z-Medica's Patents. Before the Court now is Z-Medica's Motion to Dismiss for Lack of Personal Jurisdiction and Failure to State a Claim.

Because Protégé has made a prima facie showing that Z-Medica is subject to personal jurisdiction in Minnesota, the Court will deny Z-Medica's Motion to Dismiss for Lack of Personal Jurisdiction. Because Protégé has not alleged sufficient facts to show that Z-Medica contracted with Protégé, the Court will dismiss Count I without prejudice. Because Protégé's claims of tortious interference and unjust enrichment are barred, the Court will dismiss Counts IV and V with prejudice. Because Protégé has alleged sufficient facts to support its claims of trade secret violations and non-infringement, the Court will deny Z-Medica's Motion to Dismiss with respect to Counts II, III, and VI. Finally, because Protégé has stated a claim as to the invalidity of one patent, but has not stated a claim with respect to others, the Court will dismiss Count VII in part and without prejudice.

## BACKGROUND

Protégé is a Minnesota company that was founded in 2011 by Michael and Susan Wuollet. (1st Am. Compl. ("FAC") ¶¶ 4, 9, Jan. 25, 2019, Docket No. 52.) Protégé specializes in researching, inventing, and developing hemostatic, or blood-clotting,

products.  (*Id.* ¶¶ 10, 13.)  Its products are available for sale in the animal market and have recently been cleared by the Food and Drug Administration for sale in the human market.  (*Id.* ¶ 12.)  Protégé keeps certain information collected in its research and development work as trade secrets.  (*Id.* ¶ 13.)

Z-Medica is a Delaware LLC with its principal place of business in Connecticut.  (*Id.* ¶ 5.)  Z-Medica manufactures "QuikClot" products, which accelerate blood clotting in humans.  (Decl. of Dina Dubey ("Dubey Decl.") ¶ 4, Feb. 7, 2019, Docket No. 62.)  Z-Medica sells its products throughout the U.S. and internationally, with less than 1% of revenue coming from sales in Minnesota.  (*Id.* ¶ 6-7.)  Z-Medica employs 121 people throughout the U.S., with approximately half reporting to its Connecticut office.  (*Id.* ¶ 9.)  Two employees work from home offices in Minnesota as sales representatives.  (*Id.* ¶ 10.)  Z-Medica sells its products in Minnesota, but does not have an office in the state and is not licensed to do business here.  (FAC ¶ 7; Dubey Decl. ¶¶ 9, 11, 14.)

## II.     Investment Discussions and Non-Disclosure Agreement

In December 2017, Protégé hired Duff & Phelps, a financial advising firm, to assist in its efforts to sell the company.  (FAC ¶ 15.)  Duff & Phelps reached out to Doug Schillinger, a Managing Director at Z-Medica's minority owner DW Healthcare Partners ("DWHP"), a private equity investment firm, to initiate a discussion about Z-Medica acquiring Protégé.  (*Id.* ¶ 16; Dubey Decl. ¶ 17-18.)  Schillinger was also a member of Z-Medica's Board of Directors at the time.  (FAC ¶ 16.)  Protégé alleges that both it and Duff & Phelps understood Schillinger to be an agent of Z-Medica when Duff & Phelps reached

out to him.  (FAC ¶ 17.)  Duff & Phelps also sent two emails directly to Z-Medica prior to the acquisition discussions.  (Dubey Decl. ¶ 19.)

On January 23, 2018, Schillinger and Protégé signed a non-disclosure agreement ("the NDA").  (FAC ¶ 18; Decl. of Adam Stormoen ("Stormoen Decl.") ¶ 4, Ex. 1 ("NDA") at 5, Dec. 12, 2018, Docket No. 26-1.)  The NDA was created by Duff & Phelps and is titled "Project Falcon," which was Duff & Phelps's internal reference to Protégé. (Stormoen Decl. ¶ 4; NDA at 1.)  The body of the NDA does not identify either Z-Medica or DWHP, instead stating, "[t]he [BLANK] ("Buyer") is interested in obtaining information about [Protégé] in order to study the feasibility of Buyer's purchase of [Protégé]."  (NDA at 1.)  It prohibits "the Buyer" from using Protégé's "Confidential Information . . . for any purpose whatsoever other than for the purpose of studying the feasibility of a purchase of [Protégé] by Buyer."  (*Id.*)  The NDA excludes from the definition of "Confidential Information" any information in the public domain at the time of the NDA's execution; information which becomes public after execution; and information independently developed by "the Buyer" without use of Protégé's Confidential Information.  (*Id.* at 2-3.)

Below his signature on the NDA, Schillinger listed his company as DWHP and his title as Managing Director.  (*Id.* at 5.)  Nonetheless, Protégé alleges that Schillinger "held himself out as having authority to sign an NDA on behalf of Z-Medica" and that it entered discussions with Z-Medica because it understood that Z-Medica was bound by the NDA as "the Buyer."  (FAC ¶¶ 19, 24.)  Protégé also alleges that, prior to any direct discussions with Z-Medica, Schillinger made Z-Medica employees aware of the NDA.  (*Id.* ¶ 21.)

On February 9, 2018, Protégé attended a conference call with Schillinger, representatives from Duff & Phelps, and two directors from Z-Medica. (FAC ¶ 29; Dubey Decl. ¶ 20.) Protégé alleges that it prefaced the discussion with the statement, "[s]ince we're all under an NDA," and that no one from Z-Medica denied being subject to the NDA. (FAC ¶ 29.) During the call, Protégé shared confidential and trade secret information. (FAC ¶ 30.) This information included "a unique combination of: (1) Protégé's technical information; (2) Protégé's know-how information; (3) Protégé's strategy in obtaining its patent, and (4) Protégé's marketing strategy," (collectively, "Trade Secret Information"). (*Id.*) Protégé alleges that Z-Medica was unaware of the Trade Secret Information prior to the call. (*Id.* ¶ 32.)

Following the February 9 call, Dina Dubey, Z-Medica's Chief Operating Officer, and Jessica Gould, Z-Medica's then-Director of Corporate Development, emailed Duff & Phelps to coordinate Protégé's attendance at a previously scheduled testing session in Boston, where Z-Medica was planning to test products from several companies. (Dubey Decl. ¶¶ 1, 20-21, 23.) Susan and Michael Wuollett attended that testing session with Dubey and Gould on April 17. (*Id.* ¶ 24.) Afterward, Susan Wuollett exchanged thank you emails with Dubey and Gould. (*Id.* ¶ 25.) On May 5, 2018, Z-Medica emailed Duff & Phelps to state that Protégé's product did not meet Z-Medica's standards. (*Id.* ¶ 27.)

## III. The Patent

Both Protégé and Z-Medica use materials known as aluminum silicates in their products. (*See* FAC ¶¶ 62, 97-98.) Aluminum silicates may be hydrated or non-hydrated.

(*See id.*) Hydrated aluminum silicates include materials known as clay, Kaolin, and Kaolinite. (FAC ¶¶ 98, 101.) Z-Medica uses hydrated aluminum silicates in its inventions, while Protégé does not. (FAC ¶¶ 101-02.)

On April 10, 2018, Z-Medica filed a continuation patent application (the "Continuation Application") for its "Clay-Based Hemostatic Agents." (FAC ¶ 34; Decl. of Charles Nauen ¶ 2, Ex. 1 ("Continuation App.") at 2, Feb. 7, 2019, Docket No. 61-1.) Z-Medica applied for a continuation of application No. 15/841,843, which itself was a continuation of other Z-Medica patent applications dating back to 2006. (Continuation App. at 2.) Protégé alleges that Z-Medica relied on and incorporated Trade Secret Information it obtained during the February 9 conference call in the Continuation Application to "expand the scope of [its] patented subject matter." (FAC ¶¶ 34-36.)

Protégé does not specify where its Trade Secret Information appears in the Continuation Application or how its use expands Z-Medica's patent portfolio. Both the Continuation Application and an earlier application dated November 29, 2007, describe the use of hydrated aluminum silicates in Z-Medica's inventions. (Continuation App. at 10, 15.) Likewise, both applications state that, while "[t]he hemostatic agents generally include clay materials," "[t]he present invention is not limited to clay," and reference other hemostatic materials that are within the inventions' scope. (*Id.* at 10, 25.)

The Continuation Application was approved on October 2, 2018, and became the "'106 Patent." (FAC ¶¶ 42-43 & Ex. A, Docket No. 52-1.) The '106 Patent describes the use of both hydrated aluminum silicates, such as kaolin, and unspecified aluminum silicates. (*See* '106 Patent at 20.)

In September 2018, the Food and Drug Administration cleared Protégé's gauze product for use in the human market, and Protégé made plans to market the product. (FAC ¶ 41.) However, following approval of the Continuation Application, on October 10, Protégé received a letter (the "Letter") from Z-Medica warning Protégé that if it marketed its gauze product, it would risk patent infringement allegations from Z-Medica. (*Id.* ¶ 43 & Ex. 2 ("Letter") at 1, Jan. 25, 2019, Docket No. 52-2.) Specifically, the Letter warned that Protégé's product would infringe on Claims 1 and 11 of the '106 Patent and possibly on other Z-Medica patents. (Letter at 1; FAC ¶ 43.)

Protégé alleges that its product is ready to ship and that it has "multiple imminent business deals that would deliver its product to the human market in 2019." (FAC ¶¶ 45-46.) Protégé also alleges that companies have decided not to do business with Protégé because of Z-Medica's statements about patent infringement. (*Id.* ¶ 48.)

## IV. Procedural History

Protégé brought this action against Z-Medica on January 25, 2019, alleging seven Counts: (I) Breach of NDA; (II) Violation of the FDTSA, 18 U.S.C. § 1836; (III) Violation of the MUTSA, Minn. Stat. § 325C.01 et seq.; (IV) Unjust Enrichment; (V) Tortious Interference; (VI) Declaratory Judgment of Non-Infringement; and (VII) Declaratory Judgment of Invalidity of Z-Medica's Patents. (FAC ¶¶ 50-108.) On February 7, 2019, Z-Medica moved to dismiss the Amended Complaint for lack personal jurisdiction pursuant to Rule 12(b)(2) and for failure to state a claim pursuant to Rule 12(b)(6). (Mot. to Dismiss, Feb. 7, 2019, Docket No. 57.)

## DISCUSSION

## I.    Personal Jurisdiction

### A.    Standard of Review

"Federal Circuit law applies to the jurisdictional analysis for a claim of patent infringement." *WhatRU Holding, LLC v. Bouncing Angels, Inc.*, 2014 WL 641517, at *2 (D. Minn. Feb. 19, 2014) (citing *3D Sys. V. Aarotech Labs., Inc.*, 160 F.3d 1373, 1377 (Fed. Cir. 1998)).  "When the action includes non-patent claims that go 'hand-in-hand' with the patent infringement claim, Federal Circuit law also applies to the non-patent claims." *Id.* (quoting *Amana Refrigeration, Inc. v. Quadlux, Inc.*, 172 F.3d 852, 856-57 (Fed. Cir. 1999)).  Because Protégé's patent claims arise out of the same set of facts and are "intimately involved" with its non-patent claims, the Court will apply Federal Circuit law in deciding jurisdictional questions.  *Id.*

"Because the parties have not conducted discovery, [Protégé] need[] only to make a prima facie showing that [Z-Medica was] subject to personal jurisdiction" in Minnesota. *Silent Drive, Inc. v. Strong Industries, Inc.*, 326 F.3d 1194, 1201 (Fed. Cir. 2003) (internal quotation marks omitted).  For purposes of a prima facie showing, the Court must view "the pleadings and affidavits . . . in the light most favorable to the plaintiff." *Id.* (internal quotation marks omitted).

### B.    Analysis

The Court may exercise personal jurisdiction over Z-Medica if: (1) Minnesota's long-arm statute is satisfied; and (2) exercis[ing] jurisdiction satisfies the requirements of

due process. *Silent Drive*, 326 F.3d at 1200-01. "Because Minnesota's long-arm statute, Minn. Stat. § 543.19, reaches as far as the Constitution allows, the Court need only consider whether exercising personal jurisdiction over [Z-Medica] is consistent with due process." *Pope v. Elabo GmbH*, 588 F. Supp. 2d 1008, 1014 (8th Cir. 2008) (citing *Valspar Corp. v. Lukken Color Corp.*, 495 N.W.2d 408, 410-11 (Minn. 1992)).

Due process requires that a defendant has "purposefully established 'minimum contacts' in the forum State." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Sufficient minimum contacts exist where a defendant "should reasonably anticipate being haled into court" in the forum state. *Id.* (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). A defendant may reasonably anticipate being haled into court when he "purposefully avails [himself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id*. at 475 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).

Here, Protégé argues that the Court has specific, rather than general, jurisdiction over Z-Medica. Specific jurisdiction exists where "the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." *Avocent Huntsville Corp. v. Aten Intern. Co., Ltd.*, 552 F.3d 1324, 1330 (Fed. Cir. 2008) (internal citations and quotation marks omitted) (citing *Burger King*, 471 U.S. at 472-73).

To assess jurisdiction, the Federal Circuit applies a three-factor test. *Inamed Corp. v. Kuzmak*, 249 F.3d 1356, 1360 (Fed. Cir. 2001). "The three factors are: (1) whether the

defendant 'purposefully directed' its activities at residents of the forum; (2) whether the claim 'arises out of or relates to' the defendant's activities with the forum; and (3) whether assertion of personal jurisdiction is 'reasonable and fair.'" *Id.* (quoting *Akro Corp. v. Luker*, 45 F.3d 1541, 1545 (Fed. Cir. 1995)). The first two factors assess minimum contacts, while the final factor assesses reasonableness. *Id.* "[T]he burden of proof is on the plaintiff to establish 'minimum contacts.' However . . . the burden of proof is on the defendant to demonstrate the presence of other considerations that render the exercise of jurisdiction unreasonable." *Id.* (citing *Akro*, 45 F.3d at 1546).

The Court will first assess whether specific personal jurisdiction exists over Z-Medica with respect to the patent, or declaratory judgment, claims, and will then turn to the remaining claims.

### i.    The Patent Claims

"In the context of declaratory judgment actions involving assertions of patent noninfringement or invalidity . . . [m]inimum contacts may be established by 'the threat of an infringement suit, as communicated in a cease-and-desist letter.'" *Xilinx, Inc. v. Papst Licensing GmbH & Co. KG*, 848 F.3d 1346, 1354 (Fed. Cir. 2017) (quoting *Red Wing Shoe Co., Inc. v. Hockerson-Halberstadt, Inc.*, 148 F.3d 1355, 1360 (Fed. Cir. 1998)).  A "defendant purposefully directs his activities at residents of the forum when the defendant sends a cease and desist letter to a potential plaintiff in that particular forum.  And a subsequent declaratory judgment action by that potential plaintiff 'arises out of or relates to' the defendant's activity." *New World Int'l, Inc. v. Ford Global Technologies, LLC*, 859

F.3d 1032, 1037 (Fed. Cir. 2017). However, the Federal Circuit has also held that cease-and-desist letters alone do not satisfy the third prong of the personal jurisdiction test—whether exercise of jurisdiction comports with notions of fair play and substantial justice. *Red Wing*, 148 F.3d at 1360. Underlying that holding is the notion that patentees should be able to "inform others of [their] patent rights without subjecting [themselves] to jurisdiction in a foreign forum." *Id.* at 1360-61.

Here, Z-Medica purposefully directed its activities at Protégé through the cease-and-desist letter, and Protégé's declaratory judgment claims undoubtedly "arise out of or relate to" those activities. Thus, the only remaining question is whether exercising personal jurisdiction over Z-Medica would be unreasonable or unfair.

In *Avocent Huntsville Corp. v. Aten Int'l Co. Ltd.*, the Federal Circuit held that, in assessing personal jurisdiction over defendant patentees in declaratory judgment actions, sales covered by the relevant patent do not support specific jurisdiction. 552 F.3d 1324, 1336 (Fed. Cir. 2008). The court explained that, "'to comport with fair play and substantial justice,'" the defendant must have engaged in some "other activities" directed at the forum state–in addition to sending a cease-and-desist letter–that "relate in some material way to the enforcement or defense of the patent." *Id.* at 1333, 1336 (quoting *Silent Drive.*, 326 F.3d at 1202 (Fed. Cir. 2003)). Such activities might include "initiating judicial or extra-judicial patent enforcement within the forum, or entering into an exclusive license agreement or other undertaking which imposes enforcement obligations with a party residing or regularly doing business in the forum." *Id.* at 1334.

The Federal Circuit has since clarified its holding in *Avocent*. In *Jack Henry &
Associates, Inc. v. Plano Encryption Technologies, LLC*, the defendant threatened litigation
against banks in the Northern District of Texas via cease-and-desist letters. 910 F.3d 1199,
1202-1203 (Fed. Cir. 2018). In evaluating specific personal jurisdiction, the court
explained that *Avocent* and *Red Wing Shoe* "did not create . . . a rule" that "patent
enforcement letters can never provide the basis for jurisdiction in a declaratory judgment
action," and noted that to find otherwise "would contradict the [Supreme] Court's directive
to 'consider a variety of interests' in assessing whether jurisdiction would be fair." *Id.* at
1206 (quoting *Bristol-Myers Squibb Co. v. Superior Court of Cal.*, 137 S.Ct. 1773, 1780
(2017)). The court also noted that, as the Supreme Court made clear in *Bristol-Myers*, "'the
primary concern' is 'the burden on the defendant.'" *Id.* (quoting *Bristol-Myers*, 137 S. Ct.
at 1780). Citing the Northern District of Texas's "substantial interest" in protecting its
residents from patent infringement claims, as well as the defendant's failure to show–or
even argue–that litigating in the district would be unduly burdensome, the *Jack Henry* court
found that the defendant was subject to personal jurisdiction there. *Id.*

Applying the principles articulated in *Jack Henry* and considering all the interests
involved in this case, the Court finds that subjecting Z-Medica to personal jurisdiction in
Minnesota would not offend due process. First, the Court finds it significant that Z-Medica
not only sent a cease-and-desist letter to Protégé, but also allegedly used Protégé's trade
secrets in obtaining the patent that is the subject of the letter. Even without considering
other interests, these allegations mitigate concerns about fairness. The allegations also
bolster Minnesota's interest in protecting its residents from potentially unwarranted claims

12

of patent infringement. Finally, there is no indication that litigating in Minnesota would be unduly burdensome for Z-Medica, and Z-Medica has not argued otherwise.

Accordingly, the Court finds that, with respect to Counts VI and VII, Z-Medica has failed to "make a 'compelling case' that the exercise of jurisdiction in [Minnesota] would be unreasonable and unfair." *Jack Henry*, 910 F.3d at 1205.

### ii.     The Non-Patent Claims

Having found that specific personal jurisdiction exists over Z-Medica with respect to Protégé's declaratory judgment claims, the Court must decide whether personal jurisdiction over the remaining claims is proper.

Under 28 U.S.C. § 1367(a), "in any civil action of which the district courts have original jurisdiction," a district court has "supplemental jurisdiction over all other claims that . . . form part of the same case or controversy." "This statute confers supplemental jurisdiction with respect to both subject matter and personal jurisdiction where the 'same case or controversy' requirement is satisfied." *Silent Drive*, 326 F.3d at 1206. "The Supreme Court has held that such claims must arise out of a 'common nucleus of operative fact.'" *Id.* (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966)).

Here, Protégé alleges that Z-Medica used Protégé's Trade Secret Information in the same patents that are the subject of the declaratory judgment, unjust enrichment, and tortious interference claims. The same Trade Secret Information is involved in Protégé's breach of contract claim. As such, the Court finds that it has personal jurisdiction over Z-Medica with respect to Counts 1-5.

Accordingly, the Court will deny Z-Medica's motion to dismiss for lack of personal jurisdiction.

## II.    Failure to State a Claim

### A.    Standard of Review

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint states a "claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)).  To survive a motion to dismiss, a complaint must provide more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Although the Court accepts the complaint's factual allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Twombly*, 550 U.S. at 555 (internal quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility," and therefore must be dismissed.  *Id.* (internal quotation marks omitted). The Court construes the complaint in the light most favorable to the plaintiff, drawing all inferences in their favor. *Ashley Cty., Ark. v. Pfizer, Inc*., 552 F.3d 659, 665 (8th Cir. 2009).

In reviewing a motion to dismiss, the Court may consider the allegations in the complaint as well as "those materials that are necessarily embraced by the pleadings." *Schriener v. Quicken Loans, Inc.*, 774 F.3d 442, 444 (8th Cir. 2014).

### B.   Count I–Breach of Contract (NDA)

Protégé and Z-Medica dispute whether a contract was formed between them in the first instance. Because the NDA was signed by Doug Schillinger, Z-Medica argues that it was not a party to the contract and therefore could not have breached it. Thus, the Court must decide whether Protégé has pleaded facts sufficient to show that Schillinger had actual or apparent authority to act on behalf of Z-Medica when signing the contract. In making this determination, the Court will turn to the law of agency.

An agent's actual authority may be express or implied. *Hockemeyer v. Pooler*, 268 Minn. 551, 565 (1964).[1] "Express authority is that authority which the principal directly grants to the agent. Implied authority includes only those powers which are essential to carry out the duties expressly delegated." *Id.*

Protégé argues that, as a member of Z-Medica's Board of Directors, Schillinger had express authority to sign the NDA on Z-Medica's behalf. To support this assertion, Protégé alleges that Schillinger held himself out as having such authority and that, during the February 9 conference call, Z-Medica did not deny being bound by the NDA. These

---

[1] The NDA is governed by the laws of Delaware. However, because the parties dispute a question of contract formation, the Court will apply Minnesota law to determine the validity of the contract. *See John T. Jones Const. Co. v. Hoot General Const. Co., Inc.*, 613 F.3d 778, 782-83 (8th Cir. 2010) ("[T]he choice-of-law provision can have no effect until the court determines the validity of the contract itself.") The Court notes, however, that it would reach the same conclusions under Delaware law.

allegations are insufficient. Protégé relies on Schillinger's status as a member of Z-Medica's Board of Directors, but cites no facts showing that Z-Medica granted its board members authority to enter contracts on behalf of the organization. Indeed, that Schillinger signed the NDA as an employee of DWHP suggests, if anything, that he did **not** have such authority. Neither Z-Medica's failure to deny being subject to the NDA nor Schillinger's own actions leading up to execution of the contract suggests otherwise. The relevant inquiry is whether **Z-Medica**–not Schillinger–intended to grant Schillinger authority to sign the contract on its behalf. *See id.* ("'[N]o one can become the agent of another except by the will of the principal. . . .'") (quoting *Burchard v. Hull*, 71 Minn. 430, 435 (1898)). Protégé has alleged no facts showing that Z-Medica granted Schillinger authority to sign the NDA, or even that Z-Medica knew of its execution.

Protégé's argument regarding implied authority fares no better. To succeed on a theory of implied authority, Protégé must allege facts showing that Schillinger's authority to execute the NDA was implied from "the duties expressly delegated" to him by Z-Medica. *See Hockemeyer*, 268 Minn. at 565. Protégé alleges that Schillinger made Z-Medica aware of the NDA prior to the February 9 conference call. But this has no bearing on the authority granted to Schillinger, implied or otherwise, by Z-Medica at the time of signing. Without more, Protégé's assertion that Schillinger was authorized to sign the NDA on Z-Medica's behalf is merely "a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555.

Although Protégé has not shown that Schillinger had actual authority to execute the NDA for Z-Medica, Z-Medica could nevertheless be bound by the NDA under the law of

apparent authority. "The elements of apparent authority include: 1. A manifestation by the principal that another is his agent; 2. The person who deals with the supposed agent must know of these manifestations at the time of dealing; 3. The manifestation of apparent authority must be by the principal's actions, not the agent's." *Lyman Lumber Co. v. Three Rivers Co.*, 400 N.W.2d 811, 813 (Minn. Ct. App. 1987) (citing Restatement (2d) of Agency § 8; *Truck Crane Service Co. v. Barr-Nelson, Inc.*, 329 N.W.2d 824, 826 (Minn. 1983)). If he does not "intend to cause the third person to believe that the agent is authorized to act for him," a principal may nonetheless be bound if "he should realize that his conduct is likely to create such [a] belief." Restatement (2d) of Agency § 27; *see also McGee v. Breezy Point Estates*, 283 Minn. 10, 22 (1969).

Protégé alleges that Schillinger had apparent authority to bind Z-Medica because Schillinger arranged the conference call with Z-Medica, Z-Medica was the proposed acquirer of Protégé, Protégé believed that Schillinger had authority, and Z-Medica did not deny being subject to the NDA during the conference call. Again, these allegations demonstrate nothing about Z-Medica's manifestations to Protégé **at the time of dealing**, nor do they show that Z-Medica was even aware of the NDA when it was executed. At most, they show that Protégé believed Schillinger was authorized to contract for Z-Medica. But Z-Medica is not bound by Protégé's beliefs—however sincere—about Schillinger's role or authority. As such, the Court finds that Protégé has failed to show that Schillinger had apparent authority to contract on behalf of Z-Medica.

Because Protégé has not pleaded facts sufficient to show that Z-Medica was bound by the NDA, Count I will be dismissed without prejudice.

## C.    Counts II and III–Violations of FDTSA and MUTSA

Both the MUTSA and DTSA provide damages for the "misappropriation" of a "trade secret." *See* Minn. Stat. § 325C.03; 18 U.S.C. § 1836(b)(3). The Court must therefore decide whether Protégé has pleaded facts sufficient to show both that it has "trade secrets" as defined by the statutes and that Z-Medica "misappropriated" them.

### i.    Existence of Trade Secrets

To establish the existence of trade secrets, a plaintiff must plead facts showing that: "[(1)] the information had independent economic value due to its secrecy, [(2)] [the information] was not readily ascertainable by others and [(3)] that [the plaintiff] took efforts to maintain its secrecy." *Hot Stuff Foods, LLC v. Dornbach*, 726 F. Supp. 2d 1038, 1044 (D. Minn. 2010). Because of the sensitive nature of the alleged trade secret information underlying the claims, a plaintiff need not "identify [its] trade secrets with specificity in the . . . Complaint." *Deluxe Financial Service, LLC v. Shaw,* 2017 WL 3327570, at *4 n.3 (D. Minn. Aug. 3, 2017). Indeed, to do so would "paradoxically jeopardize" the plaintiff's ability to protect its trade secrets. *Id.* At the same time, as with any claim, the plaintiff "cannot rely on conclusory statements that simply repeat the elements its claim; the plaintiff must disclose sufficient information to infer more than a mere possibility of misconduct." *TE Connectivity Networks, Inc. v. All Systems Broadband, Inc.*, 2013 WL 6827348, at *3 (D. Minn. Dec. 26, 2013).

Protégé has adequately alleged the existence of trade secrets. Protégé alleges that it developed various trade secrets while researching and creating its inventions. These

include: "(1) Protégé's technical information; (2) Protégé's know-how information; (3) Protégé's strategy in obtaining its patent; and (4) Protégé's marketing strategy." (FAC ¶ 30.) Protégé has also alleged that the information has value because of its secrecy, explaining that if the information were public, it would undermine Protégé's competitive advantage in the industry. Finally, Protégé has described its efforts to maintain the information's secrecy, including by identifying documents with trade secret information, creating contracts, and requiring its employees to enter employment agreements. (*See* FAC ¶ 59.)

Z-Medica argues that Protégé's allegations are as vague as the allegations in *Hot Stuff Foods v. Dornbach*, where the court dismissed the plaintiff's trade secret claim as conclusory. 726 F. Supp. 2d 1038, 1044 (D. Minn. 2010). In that case, the plaintiff failed to describe the secret nature of the information and what steps it took to protect the information's secrecy. *Id.* Instead, the plaintiff simply repeated the elements necessary to establish the existence of a trade secret. *Id.* In contrast, here, Protégé has described the economic value of its information's secrecy and explained its efforts to safeguard it. As such, *Hot Stuff Foods* is distinguishable and does not support dismissal of Protégé's claims.

Z-Medica also argues that, because Protégé publishes its patents on its website, it cannot argue that the information in those patents is secret. The Court disagrees. As Protégé points out, while pieces of information may be made public through its patents, that information may nonetheless continue to be combined in unique ways that give Protégé a competitive advantage. *See 3M v. Pribyl*, 259 F.3d 587, 595-96 (7th Cir. 2001) ("A trade secret can exist in a combination of characteristics and components, each of which, by

19

itself, is in the public domain . . . .").  Moreover, it is difficult to say whether any of the allegedly misappropriated information is public when that information has yet to be identified with specificity.

Accordingly, the Court finds that Protégé has adequately pleaded the existence of trade secrets.

### ii.    Misappropriation

Misappropriation is defined as "acquisition," "disclosure or use of a trade secret without express or implied consent by a person who, at the time of disclosure or use, knew that the utilization of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use."  *TE Connectivity*, 2013 WL 6827348, at *2 (citing Minn. Stat. § 325C.01, subd. 3(ii)); *see also* 18 U.S.C. § 1839(5)(B).  Protégé contends that Z-Medica misappropriated its trade secret information by incorporating it into its Continuation Application and, subsequently, the '106 Patent.  Z-Medica argues that Protégé's allegations are based on a legal impossibility because a continuation application cannot include new information and, therefore, Z-Medica's Continuation Application could not have incorporated Protégé's trade secrets.

A continuation application is one that "contains or is amended to contain a specific reference to the earlier filed application." 35 U.S.C. § 120.  The benefit of a continuation application is that the new patent has the same effect as if it were filed on the date of the previous application.  *Id.*  This "benefit only applies to claims that recite subject matter adequately described in an earlier application, and does not extend to claims with subject

matter outside the description in the earlier application." *Studiengesellschaft Kohle,*

*M.B.H. v. Shell Oil Co.*, 112 F.3d 1561, 1564 (Fed. Cir. 1997). Because of this limitation,

Z-Medica asserts that its Continuation Application could not have included information—

trade secret or otherwise—that was not included in its earlier applications. In support, Z-

Medica points out that the "disclosure in the March 2007 application uses the same text as

the disclosure in the April 2018 application." (Def.'s Mem. in Supp. at 23, Feb. 7, 2019,

Docket No. 60.)

Z-Medica's argument is overstated. While the texts of the 2007 and 2018

applications are identical in some places, in others, they are not. It is plausible that these

differences reflect the incorporation of information learned from Protégé. It is also

plausible that Protégé's trade secrets were incorporated into the Continuation Application

through changes small enough to keep the subject matter within the realm of that described

in the earlier patent. To state otherwise prior to discovery would be premature. Thus,

Protégé has satisfied its pleading requirement.

Accordingly, the Court will deny Z-Medica's motion to dismiss Counts II and III.

### D.    Counts IV and V–Unjust Enrichment and Tortious Interference with Prospective Economic Advantage

The Court must next determine whether, as Z-Medica argues, Protégé's remaining

common law claims are displaced by the MUTSA. The MUTSA "displace[s] conflicting

tort, restitutionary, and other law of [the] state providing civil remedies for

misappropriation of a trade secret." Minn. Stat. § 325C.07(a). However, the MUTSA does

not affect contractual remedies or civil remedies that are not based upon misappropriation of a trade secret. *Id.* § 325C.07(b). Thus, a plaintiff may "maintain separate causes of action 'to the extent that the causes of action have "more" to their factual allegations than the mere misuse or misappropriation of trade secrets.'" *SL Montevideo Technology, Inc., v. Eaton Aerospace, LLC*, 292 F. Supp. 2d 1173, 1179 (D. Minn. 2003) (quoting *Micro Display Sys., Inc. v. Axtel, Inc.*, 699 F. Supp. 202, 205 (D. Minn. 1988)).

Protégé's unjust enrichment claim is displaced by the MUTSA. Protégé alleges that "Z-Medica's use of Protégé's Confidential, Proprietary, and Trade Secret Information was and is a benefit to Z-Medica, whose use, without providing compensation, constitutes unjust enrichment." (FAC ¶ 83.) In making this claim, Protégé alleges nothing more than that Z-Medica misused its Trade Secret Information. Protégé argues that its "Confidential" information is distinct from its "Trade Secret Information," adding "more" to the claim than allegations of trade secret misappropriation. But nowhere does Protégé allege facts showing how its Confidential Information is distinct from its Trade Secret Information. To the contrary, Protégé treats its "Confidential, Proprietary, and Trade Secret Information" as one unit throughout the Complaint. Accordingly, the Court will dismiss Count IV with prejudice.

While Protégé relies on the same allegations of misuse of trade secret information in its tortious interference claim, Protégé also bases that claim in part on Z-Medica's assertions of patent infringement. To that extent, the claim may not be displaced by the MUTSA. The Court need not make a determination on this issue, however, because the tortious interference claim will be dismissed on other grounds.

In making its tortious interference claim, Protégé relies on Z-Medica's assertion of patent infringement through the cease-and-desist letter. But under federal patent law, a patent holder may not be held liable for its "good faith communications asserting infringement." *Inline Packaging, LLC v. Graphic Packaging International, LLC*, 351 F. Supp. 3d 1187, 1215 (D. Minn. 2018) (quoting *Matthews Int'l Corp. v. Biosafe Eng'g, LLC*, 695 F.3d 1322, 1332-33 (Fed. Cir. 2012)). To show bad faith, "a plaintiff claiming that a patent holder has engaged in wrongful conduct by asserting claims of patent infringement must establish that the claims of infringement were objectively baseless." *Id.* (quoting *Matthews*, 695 F.3d at 1332). Objective baselessness exists when the claims are such that "no reasonable litigant could reasonably expect success on the merits." *Dominant Semiconductors Sdn. Bhd. v. OSRAM GmbH*, 524 F.3d 1254, 1260 (Fed. Cir. 2008) (quoting *GP Indus., Inc. v. Eran Indus., Inc.*, 500 F.3d 1369, 1374 (Fed. Cir. 2007)). Objective baselessness is not established based on the patent holder's subjective intent. *Id.* at 1261. Thus, here, Protégé must allege facts that, taken as true, show that Z-Medica's allegations of patent infringement were so objectively baseless that no litigant could reasonably expect success on the merits.

While Protégé certainly suggests that Z-Medica acted with **subjective** bad faith in sending the cease-and-desist letter, Protége has not shown—or even argued—that the assertion of infringement was **objectively** baseless. Indeed, it would be difficult for Protégé to do so; whether or not Z-Medica's assertions of infringement have merit, based on the apparent similarities of Protégé's and Z-Medica's products, it is not true that "no reasonable litigant could reasonably expect success on the merits." Since Protégé's

remaining basis for the tortious interference claim—misappropriation of trade secrets—is barred, the claim cannot move forward. Accordingly, the Court will dismiss Count V with prejudice.

### E.    Counts VI and VII–Declaratory Judgment Claims

Protégé seeks declaratory judgments of non-infringement and patent invalidity with respect to six Z-Medica patents (the "Patents"), including the '106 Patent.[2]

### i.    Non-Infringement

Protégé alleges that the claims of all the Patents require the presence of hydrated aluminum silicates and argues that, because its own product does not use a hydrated aluminum silicate, it cannot infringe on any of the Patents.[3]

A patent infringement analysis requires two steps. *See, e.g.*, *Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1323 (Fed. Cir. 2002). First, the court determines the scope of the claims as a matter of law. *Id.* Then, the finder of fact determines whether "all of the limitations of at least one claim are present" in the allegedly infringing device. *Id.* Z-Medica argues that Protégé has failed to show non-infringement because it has not alleged facts showing that its product infringes upon **none** of the claims in the '106 Patent.

The factual basis for Z-Medica's argument lies in the difference between hydrated and non-hydrated aluminum silicates. Certain of the claims in the '106 Patent explicitly

---

[2] The Patents include claims 1 and 11 of the '106 Patent and U.S. Patent Nos. 8,257,732; 8,383,148; 8,784,876; 9,078,782; and 9,821,084. (FAC ¶ 97.)

[3] Only details of the '106 Patent have been disclosed to or discussed before the Court. As such, the Court will make its determination on this claim's sufficiency based only on allegations surrounding that patent.

mention "clay," "kaoline," or kaolinite," all of which are hydrated aluminum silicates. Since Protégé alleges that its own product contains **non-**hydrated aluminum silicate, its product cannot infringe on those claims. In contrast, other claims in the '106 Patent mention the use of "aluminum silicates," without specifying whether they are hydrated or non-hydrated. According to Z-Medica, this leaves open the possibility that its products use non-hydrated aluminum silicates—like Protégé's product—and, therefore, that Protégé's product infringes on the '106 Patent.

Z-Medica correctly notes that, at least with respect to certain claims, the language of the '106 Patent leaves open room for interpretation as to the materials used. But Protégé is not required to prove its case before discovery. It must only allege facts that, **construed in the light most favorable to it**, state "a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678. Put simply, Protégé alleges that the products described in Z-Medica's Patents use hydrated aluminum silicates and that its own do not. Viewing those allegations in the light most favorable to Protégé and reviewing the '106 Patent (titled "Clay-Based Hemostatic Agents"), the Court finds it plausible that Z-Medica's products contain only hydrated aluminum silicates and, therefore, that Protégé's product does not infringe on them.

Accordingly, the Court will deny Z-Medica's motion to dismiss Count VI.

### ii.     Patent Invalidity

Protégé seeks a declaratory judgment that Z-Medica's Patents are "anticipated, obvious, and invalid" under 35 U.S.C. §§ 102, 103, and 112. (FAC ¶¶ 107-08.) Protégé

argues that if, as Protégé alleges, the Continuation Application introduced new matter through the incorporation of Protégé's Trade Secret Information, the '106 Patent is invalid. Z-Medica argues that the allegations are insufficient because Protégé does not: (1) state the elements of invalidity that it believes apply under §§ 102, 103, and 112; nor (2) provide any factual allegations to support its claims.

Z-Medica likens Protégé's allegations to those in *Sprint Communications, Co., L.P. v. Theglobe.com, Inc.*, where the court dismissed the defendant's counterclaim of patent invalidity under Fed. R. Civ. Pro. 8. 233 F.R.D. 615, 618 (D. Kan. 2006). In that case, the claimant stated only that the patents in question were "invalid, void and/or unenforceable under one or more of the sections of Title 35 of the United States Code." *Id.* In addition to failing to identify the sections of the Code that it relied upon, the claimant also failed to allege any facts upon which its counterclaim was based. *Id.* The court therefore dismissed the counterclaim, concluding that the pleadings were so vague that they failed to "'provide the opposing party with a fair notice of the claim and the grounds upon which it rest[ed].'" *Id.* (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002)); *see also Qarbon.com Inc. v. eHelp Corp.*, 315 F. Supp. 2d 1046, 1050 (N.D. Ca. 2004) (dismissing counterclaim for declaratory judgment of patent invalidity where the claimant "fail[ed] to provide any factual basis for . . . the grounds for invalidating and voiding the . . . patent."); *Summers Mfg. Co., Inc. v. Tri-Cty. AG, LLC*, 300 F. Supp. 3d 1025, 1036-37 (S.D. Iowa 2017) (holding that the defendant counterclaimant could not rely on the plaintiff's complaint and dismissing counterclaim for declaration of invalidity where it failed to assert any facts showing how the patent was anticipated or obvious); *Smith v. Cleasby Mfg. Co., Inc.*, 2013

WL 12145972, at *7 (W.D. Mo. July 17, 2013) (dismissing counterclaims of invalidity for asserting "no factual content demonstrating why Plaintiff is entitled to relief.").

Protégé's claim is distinguishable from the line of cases relied upon by Z-Medica. In this Court's reading, the fatal flaw of the counterclaims in those cases was not that they, at least in some cases, were not based in specific sections of Title 35. Instead, it was that the claimants failed to root the claims in any factual allegations whatsoever. As such, the claimants failed to meet the fact pleading standards required by *Iqbal* and *Twombly*.[4]

Unlike the counterclaimants in each of the cases relied upon by Z-Medica, Protégé has identified the sections of Title 35 it relies on **and,** with respect to the '106 Patent, has alleged facts upon which its claim rests. Specifically, Protégé alleges that Z-Medica incorporated Protégé's Trade Secret Information into its Continuation Application. This supports Protégé's argument that the Continuation Application improperly included new matter. *See Studiengesellschaft Kohle*, 112 F.3d at 1564. While Protégé incorporates the supporting facts only by reference under Count VII, it need not reallege each of the relevant allegations that appear earlier in the Complaint. Instead, the Court should evaluate the claim in the context of the Complaint as a whole. *See Braden v. Wal-Mart Stores, Inc.*,

---

[4] Some district courts have declined to apply the *Iqbal/Twombly* pleading standard to **counterclaims** alleging invalidity, instead applying the more lenient standard that applies to patent infringement claims under Form 18 and allowing conclusory counterclaims of invalidity to proceed. *See, e.g., Adair v. Boat Dock Innovations, LLC,* Civ. No. 12-cv-1930-SCJ, 2013 WL 1859200, at *2 (N.D. Ga. Feb. 27, 2013); *InvestmentSignals, LLC v. Irrisoft, Inc.*, No. 10-cv-600-SM, 2011 WL 3320525, at *2 (D.N.H. Aug. 1, 2011). Others have applied a more lenient standard based in part on local court rules governing patent cases. *See, e.g.*, *Elan Pharma Intern. Ltd. v. Lupin Ltd.*, Civ. No. 09-1008 (JAG), 2010 WL 1372316, at *5 (D.N.J. Mar. 31, 2010); *Teirstein v. AGA Medical Corp.*, No. 6:08cv16, 2009 WL 704138, at *5 (Mar. 16, 2009). Because this Court finds that Protégé's claim meets *Iqbal/Twombly* pleading standards with respect to the '106 Patent, it will not determine whether a more lenient standard might otherwise apply.

588 F.3d 585, 594 (8th Cir. 2009) ("[E]valuation of a complaint upon a motion to dismiss is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'") (quoting *Iqbal*, 556 U.S. at 679). Reviewing the allegations in context, the Court finds that Protégé has pleaded facts sufficient to support its claim of invalidity under 35 U.S.C. §§ 102, 103, and 112 as it applies to the '106 Patent.[5]

With respect to the remaining Patents, Protégé has alleged no facts to support its claim of invalidity, nor has it provided a supporting argument in the briefings. Accordingly, the Court will dismiss Count VII only as it applies to those Patents.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss [Docket No. 57] is **GRANTED** in part and **DENIED** in part as follows:

1. Counts I, IV, and VII as to U.S. Patent Nos. 8,257,732; 8,383,148; 8,784,876; 9,078,782; and 9,821,084 are dismissed without prejudice;

2. Count V is dismissed with prejudice; and

3. The Motion is denied with respect to Counts II, III, VI, and VII ('106 Patent).

---

[5] Z-Medica also argues that the '106 Patent cannot be invalid because a patent is not invalid for adding new matter unless the application as filed does not disclose the newly claimed matter, and the Continuation Application as filed disclosed any alleged newly claimed subject matter. Z-Medica relies on *Commonwealth Scientific and Indus. Research Org. v. Buffalo Tech. (USA), Inc.*, 542 F.3d 1363 (Fed. Cir. 2008). That case is inapposite. The issue in *Commonwealth Scientific*, which did not involve a continuation application, was whether a patentholder had impermissibly added new subject matter in an amendment to its original application in violation of 35 U.S.C. § 132. *Id.* at 1379. Protégé does not argue that Z-Medica improperly added new material in an amendment to the Continuation Application; instead, it argues that the '106 Patent is invalid because Z-Medica impermissibly includes new matter in a **continuation application**.

DATED:  July 24, 2019          ___s/John R. Tunheim___
at Minneapolis, Minnesota.         JOHN R. TUNHEIM
                                      Chief Judge
                            United States District Court